IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARGARET ANDERSON, et al., Individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SOUTHERN HOME CARE SERVICES, INC., and RES-CARE, INC.,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:13-cv-00840-LMM<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF J. DEREK BRAZIEL IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS AND EXPENSES**

I, J. Derek Braziel, declare as follows:

1. I am an attorney in good standing, duly licensed and admitted to the State Bar of Texas. The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open Court if called upon to do so, and on records contemporaneously generated and kept by my Firm in the ordinary course of its law practice.

2. I provide this Declaration for the purpose of describing the work completed by my firm in this action, the basis for our rates, and expenses incurred in the course of this litigation.

**Exhibit A**

***Adequacy of Counsel***

3. I graduated *magna cum laude* from Baylor University in 1992, where I received a Bachelor of Business Administration in Marketing and Quantitative Business Analysis (Business Statistics). I attended the University of Virginia Law School from 1992 to 1995, where I served as the Chief Justice for the Law School's Moot Court Program. After graduating from law school, I clerked for the Honorable Howell Cobb, United States District Judge for the Eastern District of Texas.

4. For the first six years after I finished my clerkship with Judge Cobb, I worked for the nation's largest Labor and Employment law firm, Littler Mendelson. At Littler, I specialized in Fair Labor Standards Act ("FLSA") litigation and worked on a variety of class and collective actions. After leaving Littler in 2002, I began representing employees in overtime class and collective actions. Since that time, I have represented thousands of workers and recovered millions of dollars on behalf of my clients.

5. I have been lead counsel in over 200 overtime cases. Because of the confidential nature of most of the settlement agreements, I am limited in what I can openly state, but I have been involved in several collective and class actions for unpaid overtime ranging between 5 and 10 million dollars, with some in excess of 50 million dollars.

6. In addition to being an active litigator, I have long been involved in many educational and legal groups, including the National Employment Lawyers Association, and the Dallas Bar Association (Chair of the Labor and Employment Law Section in 2008). I have written articles for a variety of legal publications and have had articles printed and distributed in several publications, including the Dallas Bar Journal, and the ABA Treatises, *Wage and Hour Laws, A State-by-State Survey*, and *The Fair Labor Standards Act*, where I serve on the editorial board and am former Associate Editor-in-Chief of the supplement to that treatise. I have also prepared materials for many American Bar Association and Texas Continuing Legal Education presentations programs. In addition to authoring articles on a variety of employment and litigation-related subjects, I have lectured on FLSA and overtime matters at meetings, conferences, and CLE programs sponsored by the National Employment Lawyers Association, the Dallas Bar Association, the Fort Worth Bar Association, the South Texas College of Law, and the American Bar Association.

7. I have been Board Certified in Labor and Employment Law by the Texas Board of Legal Specialization since 2002.

8. I have been recognized as a SuperLawyer from 2002 to 2018. I have been recognized by my local peers as one of the Best Attorneys in Dallas eight times.

9. I have litigated hundreds of wage-and-hour cases in federal court. The vast majority of those cases involved mass litigation, either as an FLSA collective

action, a Fed. R. Civ. P. 23 class action, or a hybrid of the two. Here is a small sample of the class/collective actions I have worked on:

> Woods v. Caremark/CVS, (W.D. Mo.) (Current class counsel for over 5000 call center employees).
>
> Chin v. The Tile Shop, (D. Minn) (Class counsel for 700+ sales associates working in over 10 states; settlement approved).
>
> O'Donnell v. SWBYP, (E.D. Mo) (Class counsel for 500 call center workers in two locations in Missouri alleging failure to pay overtime; settlement approved).
>
> Shofner v. Convergys, et al. (E.D. Tex.) (Class counsel for over 5000 call center workers in five states, including two state law subclasses, for workers alleging unpaid overtime claims).
>
> Oliver v. Aegis, (N.D. Tex) (Class counsel for approximately 15,000 person class of call center workers in over ten states including state law subclasses in four states).
>
> Geddis v. Rescare, et al. (N.D. Ga.) (Class counsel for approximately 2000 home health care workers; settlement approved).
>
> Signorelli v. Utiliquest, et al., (M.D. Fla.) (Co-counsel; nationwide FLSA collective action and state class action covering eleven states and involving more than 4500 putative class members).
>
> Rosenburg v. IBM, Inc., (N.D. Cal.) (Co-counsel; nationwide collective and class action covering tens of thousands of IBM computer support personnel).
>
> Dunwiddie v. Central Locating Service, Inc., (M.D. Fla.) (Co-counsel; nationwide FLSA collective action by more than 450 locators for unpaid overtime based on at-home computer time and travel time).
>
> Pritchard v. SM&P Utility Resources, Inc., (E.D. Tex.) (Lead Counsel; nationwide FLSA collective action by 966 locators for unpaid overtime based on at-home computer time and travel time).
>
> Camp v. The Progressive Corporation, et al., (E.D. La.) (Co-Counsel on Steering Committee for class of over 1300 members; nationwide collective

4

Case 1:13-cv-00840-LMM Document 96-1 Filed 02/26/19 Page 5 of 15

action filed by adjusters for unpaid overtime).

<u>Owens v. Government Employees Insurance Company a/k/a GEICO</u>, (N.D. Tex.) (Lead counsel for class of over 1900 telephone-dedicated call center employees; nationwide FLSA collective action).

### *Time Spent on the Litigation*

10. Our firm's involvement in this matter grew out being co- lead counsel for Plaintiffs in two related matters, *Geddis v. Southern Home Care, Inc. & ResCare, Inc.*, No. 3:07-cv-036-TCB (N.D. Ga. filed May 1, 2007) and *Ford v. ResCare Inc. & Southern HomeCare, Inc.*, No. 11CV-2256-2 (Superior Ct. of Dougherty Cty. filed Oct. 6, 2011). As the Court knows, *Geddis* was a Fair Labor Standards Act (FLSA) collective action where Plaintiffs attempted to assert claims under the Georgia Minimum Wage Law (GMWL), but the Northern District refused to exercise supplemental jurisdiction over the GMWL claims. The *Ford* case was the resultant attempt to assert the GMWL claims on behalf of essentially the same class as is represented here. However, the individual Ford plaintiffs settled at the same time as the Geddis case settled. Since no class had been certified in *Ford* and many former employees of ResCare had not opted into the Geddis collective action, some 9,167 employees of ResCare remained unaffected by the settlements of the *Geddis* and *Ford* cases. Four of those present and former employees had previous contact with Class Counsel in connection with the investigation of the *Geddis* claims, but failed to submit paperwork joining that collective action. They approached Class

5

Counsel and inquired if any remedy remained for them. All four hired Class Counsel on a contingency fee basis and agreed to act as class representatives. Class Counsel filed a Complaint in DeKalb County Superior Court on February 15, 2013, and Defendants removed the case to this Court. For the next five-and-a-half years, the parties litigated the case intensely.

11. From the beginning, we knew the case presented several legal challenges. Our research could not locate any other case where a plaintiff had recovered damages under the Georgia Minimum Wage Law (GMWL), so we expected and ultimately did face several issues of first impression. Three of the issues dealt exclusively with the GMWL and its application to Class Members. The first two of these issues were raised in Defendants initial motion to dismiss, namely whether Class Members are excluded from the GMWL because they fall under an exemption to the FLSA and whether Class Members satisfy the "domestic servant" exception to the GMWL. After extensive briefing in the trial court, the Court certified these two questions to the Georgia Supreme Court. I assisted Marc Howard and Geoff Pope in the briefing and preparation of that case. Knowing that a loss on either issue would deprive the Class of any recovery, our team spent a great deal of time writing a brief that would speak to individual justices. Similarly, Pope & Howard did the same with the oral argument preparation and in fact engaged in

multiple "moots" or practice arguments. Ultimately, Justice David Nahmias authored a unanimous opinion finding in our favor on both issues.

12. The third issue specific to the GMWL consisted of whether Defendants complied with the GMWL if the pay to an employee averaged $5.15 per hour for all hours worked even though Defendants chose not to compensate the employee at all for some of the hours worked. If so, very few Class Members were likely to achieve any recovery. We addressed this issue in the context of a motion to limit discovery and again spent a great deal of time crafting statutory construction arguments on this issue of first impression, and, as the Court knows, were successful on this issue.

13. Plaintiffs case also faced numerous other legal challenges, including the application of GMWL statute of limitation, the application of the "no-piggyback" rule and cross-jurisdictional tolling to Plaintiffs' efforts to toll the statute of limitation during the pendency of the *Geddis* and *Ford* cases.

14. In addition to the work on the legal issues, discovery and the data provided informally was extensive. The parties eventually agreed to close the case administratively, exchange information, and attempt a mediation. Although the formal case was administratively closed, Class Counsel's work intensified. I took the lead in addressing the data and creating damages models, but all four of us provided input. I also worked with an outside expert to construct the models. The data included payroll, mileage, and worksite location (i.e., residence address of

7

ResCare client). The data was converted to Excel spreadsheets, which are program-limited to one million data rows. The data involved here was so voluminous (over 6 million lines of data) that numerous data files had to be transferred to different spreadsheets as they consisted of several million rows, and each row contained several different data points. Class Counsel worked extensively with the data to model damages under a variety of different scenarios (e.g., different MPH, different amounts of time in addition to driving, etc.). Class counsel hired a forensic accountant with expertise in statistics to help prepare damages models for the various scenarios.

15.    Defendants produced a damage model based on Google Maps applications, and Class Counsel had to evaluate this damages model. Specifically, Class Counsel devoted extensive time to researching modern mapping applications and conferred with two different computer mapping experts regarding the validity of claims by Defendants' expert.

16.    In addition to damages modeling and working with reams of data, Class Counsel also conducted significant investigation into the typical work habits of Class Members such as the amount of time spent at a client's home after the "billed portion" was complete, whether Class Members went home during gaps in the day, record-keeping practices, driving patterns, etc. In the lead-up to the mediation as the parties exchanged damages models, Defendants made numerous assertions to Class

Counsel regarding their business model and how it affected the "windshield time" covered by GMWL.  I assisted Class Counsel Ben Terry who took the lead on this investigation and interviewed numerous ResCare employees or former employees to determine what was actually happening "on the ground" with real employees, in real-time.  In addition to the lead Plaintiffs, Class Counsel interviewed numerous other ResCare employees and former employees, some of these were precluded from the Class by their participation in the predecessor *Geddis* litigation.  In all, our team conducted scores of interviews with lead Plaintiffs, class members, and other ResCare employees.

17. All four Class Counsel travelled to Defendants' Louisville, Kentucky headquarters for a mediation with Hunter Hughes, a well-respected mediator of national reputation.  The mediation was unsuccessful, and Mr. Hughes continued working with the parties for months after the mediation in the hopes of achieving a resolution.  Ultimately, Mr. Hughes declared an impasse, and the parties reopened the case. Negotiations continued.  These negotiations included an in person meeting between me, Defendant's counsel, and Defendant's General Counsel.  Ultimately the parties reached this resolution.  Class Counsel hired and supervised third-party administrator Simpluris in administering the settlement.

8.

18.     Class Counsel had access to all of the discovery obtained in *Geddis* and *Ford* as well as the discovery obtained in this case, so Class Counsel is convinced that it had sufficient data to evaluate the Defendants' settlement offers. I am firmly convinced that this settlement is in the best interests of Class Members. Based upon the information Class Counsel received and reviewed as well as upon discussions with the third-party administrator Simpluris, Class Members are generally receiving 160% of what they would have received is Defendants had paid Class Member $5.15 per hour under the GMWL.

19.     During the course of representing Plaintiff in this matter, my firm has: (a) communicated with the Plaintiffs, other clients and witnesses; (b) assisted with the preparation of the case for collective action treatment and class action treatment; (c) conducted legal research on various issues that arose during the prosecution of the case and communicated with co-counsel regarding findings and conclusions; (d) assisted with the investigation of Plaintiff's claims, preparations for settlement discussions, and negotiation; (e) drafted pleadings and other motions and responses; (f) prepared for and attended mediation; (g) assisted with preparation of the settlement documents; and (g) participated in overall representation of the Plaintiff, among other activities. I am of the opinion that the work done by the attorneys in my firm to date was necessary to the proper presentation of this case on behalf of Plaintiff, and that the fee requested by the Firm is reasonable. Further, reducing Class

Counsel's fee request will not help Class Members because their compensation is not dependent on the amount of fees awarded. Reducing Class Counsel's fee request will only benefit Defendants.

20. It is our firm's practice to maintain contemporaneous records from which the amount of time spent working on each case can be calculated with descriptions regarding the actual tasks involved. My usual practice, and the usual practice of the other attorneys in my firm, is to record only those hours that the firm would customarily bill to a client paying on an hourly basis. I and the firm's timekeepers also exercised billing judgment before recording time to eliminate time for duplicative tasks or to reduce time for work that may have been inefficient. The work reflected in our records was reasonably required in order to litigate this action.

21. As a 24-year attorney who is Board Certified in Labor and Employment Law, my current rate is $650.00 per hour for this kind of litigation. This is the same rate I would charge clients who I bill by the hour for similar work in similar locations. Others within my firm who have spent time litigating this action include Meredith (a 5th year associate at the time) who bills at $395.00 per hour. These rates are the firms' current billing rates for cases of this type.

22. I have personal knowledge of the hourly rates charged by other attorneys with comparable experience to mine and those who billed time on this case, including those at the other two firms. Based on that information, I believe

that our rates are at or near the market rate for attorneys with comparable expertise, experience and qualifications and are reasonable and appropriate in this case.

23. The firm spent a total of approximately 860 hours litigating this case The firm's lodestar (hours x hourly rates) on the hours expended on this issue, amounts to approximately $559,000 after writing off clerical and training tasks as part of billing judgment. The firm's costs for litigating this action are $18,397.14. The total fees and costs for Lee & Braziel, LLP are $577,397.14.

24. My law firm took this case on a contingency basis, without any assurance that we would be paid any fees or reimbursed any costs for our efforts or expenditures. At no time did we have any assurance that we would ultimately prevail in this matter or that a mutually agreeable settlement could be reached. As acknowledgment of Plaintiff's financial circumstances, Plaintiff's counsel has accepted no monies from Plaintiff for fees and costs and instead will only accept those amounts as determined and approved by the Court

25. The firm accepted the case because of the important principle of vindicating Plaintiff's statutory right to overtime pay which attaches regardless of whether or not a litigant earns a large wage or a small one. While the amount in controversy may be small relative to other actions before the Court, the importance of the case to the Plaintiff cannot be overstated.

26. By accepting Plaintiff's case, I was precluded from accepting other employment. If I had not expended its time and resources on this case, I would have devoted his time and resources to other cases and compensable work. As a result of this case, I have forgone the opportunity to perform other work for clients that would likely have paid far more quickly and profitably.

37. The requested attorneys' fees, although based on time and effort already expended, if the Court grants preliminary approval of the parties' proposed settlement, my Firm will be required to respond to Class Members' inquiries following the mailing of the payments. In my experience, settlements of this nature and size require a substantial ongoing commitment. For example, once the checks are mailed, Class Counsel and staff will likely be required to respond to inquiries from class members requesting information regarding the terms of the settlement, amount of their settlement award.

38. If the Court grants final approval to the parties' proposed settlement, Class Counsel also expects to respond to more class member inquiries after that final approval order, especially after checks are issued. Class Counsel also expects to spend additional time working on this case, including preparing for and attending the final fairness hearing, answering class member questions, answering questions from the Settlement Administrator, and negotiating and possibly litigating disagreements with Defendants about the distribution of funds. *See, e.g., Nash v.*

*CVS Carmark Corp.*, No. 09CV79, 2013 U.S. Dist. LEXIS 26414, at *8-10 (D.R.I. Feb. 25, 2013) (granting in part plaintiffs motion to order defendants to comply with class settlement agreement); *Sewell v. Bovis Lend Lease, Inc.*, No. 09CV6548, Dkt. Nos. 73, 74 (S.D.N.Y. Dec. 17, 2012) (allowing late opt-in to participate in class settlement).

I declare under penalty of perjury, under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 26 February 2019

_____
J. Derek Braziel

| Prepaid Expenses:Rescare2  --  Ending Balance:  $18,397.43 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Ref No. | Payee | Memo | Decrease | Increase | Balance | Type | Account |
| 04/13/2018 | 4362 | Hunter Hughes ADR | Check 4362 | | 3,625.00 | 18,397.43 | Expense | Braziel Law Offices |
| 09/29/2017 | 20 | THE GINGgrass | Check 20 Expert fee | | 7,920.00 | 14,772.43 | Expense | Braziel Law Offices |
| 09/06/2017 | 750 | Travel Fees | Mediation Flight, Uber, Meals.Parking | | 1,652.43 | 6,852.43 | Journal | |
| 07/24/2017 | 11 | THE GINGgrass | Check 11 Expert Fee | | 5,000.00 | 5,200.00 | Expense | Braziel Law Offices |
| 01/28/2015 | | | PHV fee | | 200.00 | 200.00 | Expense | Braziel Law Offices |
| | | | | | | | | |
| **Total** | | | | | ######### | | | |

**Exhibit 1**